1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

DENNIS FLORER,

                              Plaintiff,

        v.

CHERYL BALES-JOHNSON, JAY
JACKSON, and DIANE BENFIELD,

                              Defendants.

No. C06-5561 RJB/KLS

**REPORT AND RECOMMENDATION**
**Noted for:  September 24, 2010**

        Before the court is the motion for summary judgment of Defendants Cheryl Bales, Jay

Jackson, and Diane Benfield.  Dkt. 307.  Plaintiff Dennis Florer filed a response and cross-

motion to Defendants' motion for summary judgment.  Dkts. 323 and 324.[1]  Defendants argue

that Mr. Florer's claims should be dismissed because he has failed to state a claim under the First

Amendment and the Religious Land Use and Institutionalized Persons Act (RLUIPA), he is

barred from recovering damages from Defendants under RLUIPA, and the Defendants are

entitled to qualified immunity.

---

[1] Plaintiff also filed Plaintiff's Statement of Material Fact/Florer Declaration (Dkt. 328) and Supplement to
Plaintiff's response to Defendants' Motion for Summary Judgment and Plaintiff's Cross-Motion for Summary
Judgment (Dkt. 330).  Although Plaintiff was granted leave to file responses exceeding the page limitations (Dkt.
333), he was not granted leave to file these additional pleadings.

REPORT AND RECOMMENDATION - 1

Having carefully reviewed the parties' pleadings, supporting declarations, and balance of the record, and viewing the evidence in the light most favorable to Mr. Florer, the undersigned recommends that the Defendants' motion for summary judgment be granted.

### SUMMARY OF CASE

Mr. Florer is a Washington State prison inmate who brings claims requesting damages under 42 U.S.C. § 1983 and RLUIPA.  In his First Amended Complaint, Mr. Florer alleges that Defendants Bales, Jackson and Benfield violated his First and Eighth Amendment rights and his rights under RLUIPA in their creation of the kosher and mainline diets within the Department of Corrections (DOC).  Dkt. 190.  Mr. Florer asserts that the 2004, 2006, and 2008 kosher diet menus, and the Passover menu, are religiously and nutritionally inadequate, the 2006 and 2008 mainline diets are nutritionally inadequate and that the 2004, 2006, and 2008 kosher diet menus are retaliatory.  *Id.*

### STATEMENT OF FACTS

**A.    Kosher Diet and Mainline Diet Menus**

DOC provides a kosher diet to inmates who request one.  Dkt. 307-2, p. 3, ¶ 6 (Exh. 1, Declaration of Jay Jackson).[2]  Mr. Florer began receiving a kosher diet in 2004.  *Id.* ¶ 3.  Since 2004, Mr. Florer has repeatedly requested a kosher diet, then requested to go back on the mainline diet.  *Id.*  This change has happened multiple times since 2004.  *Id.*  Each time Mr. Florer has requested a kosher diet, he has been provided with a kosher diet.  *Id.*  At his request, Mr. Florer currently receives a mainline diet.  *Id.*   Mr. Florer does not dispute that he has received a kosher diet when he has requested one.  Dkt. 323-2, p. 21.

---

[2] For ease of reference, CM-ECF page numbering is used instead of the parties' internal page numbering to exhibits and attachments.

REPORT AND RECOMMENDATION - 2

1
2
3
4
5
6
7
8
9
10
11

The kosher diet is planned and served consistent with the laws of Kashruth.  Dkt. 307-5, p. 41, ¶ 12 (Exh. 2, Declaration of Gary Friedman).  Kashruth is the set of Jewish dietary laws governing kosher food.  *Id.,* p. 40, ¶ 9.  Gary Friedman has been endorsed by the Va'ad HaRabanim of Greater Seattle in all aspects of Jewish chaplaincy, including kosher supervision. *Id.*, p. 39, ¶ 8 and Attach. A.  Mr. Friedman provides guidance and advice to the DOC on service of the kosher diet as well as the creation and updating of the kosher diet menus.  Dkt. 307-2, p. 3, ¶ 4; Dkt. 307-5, p. 41, ¶¶ 12-13.  Mr. Friedman has reviewed and approved the kosher diet menu, as written, since its inception in 2004.  Dkt. 307-5, p. 41, ¶ 12.  Mr. Friedman has verified that the 2004, 2006, and 2008 kosher diet menus are consistent with the laws of Kashruth and are, in fact, properly kosher by strict Orthodox Jewish standards.  *Id.*

12
13
14
15
16
17
18
19
20
21
22
23
24

Mr. Friedman approved the product lists for the purchase of the food served on the 2004, 2006, and 2008 kosher diet menus.  *Id.* ¶ 13.  He receives regular bulletins and publications on changes in kosher supervision of products and advises the DOC on changes that need to be made to the kosher diet menu and product lists.  *Id.*  If any question arises as to the kosher supervision of products, Mr. Friedman consults with the appropriate authorities to ensure that the kosher diet menu meets the laws of Kashruth.  *Id.*  He personally taste tests food and submits comments to the manufacturer regarding the food and did so with the frozen kosher meals served on the 2004 and 2006 kosher diet menus and the shelf stable kosher meals served on the 2008 kosher diet menu.  *Id.*  According to Mr. Friedman, the kosher diet menu is religiously adequate and complies with the laws of Kashruth and is properly kosher by strict Orthodox Jewish standards. *Id.*

25
26

The 2004 and 2006 kosher diet menus used frozen kosher meals.  *Id.*, p. 42, ¶ 14.  Those same frozen kosher meals are commonly eaten by Kashruth observant Jews in the community.

*Id.*  They are also routinely provided on airline flights to passengers who request kosher meals and are served to Kashruth observant Jews as a kosher alternative at lunches and banquets prepared by hotels and conference centers.  *Id.*  Mr. Friedman routinely eats the frozen kosher meals at home to this day.  *Id.*  In his opinion, they are certainly edible.  *Id.*

Mr. Florer does not dispute that the kosher diet meals, including the premade dinners, comply with Jewish dietary law.  Dkt. 323-2, p. 21.

The 2008 kosher diet menu began using shelf stable kosher meals in lieu of the frozen kosher meals previously provided in 2004 and 2006.  Dkt. 307-2, p. 3, ¶ 7.  Shelf stable kosher meals were selected based on operational needs because it is simple to verify that shelf stable kosher meals are, in fact, kosher and they are less expensive than other products as they can be purchased through Correctional Industries.  *Id.*  Shelf stable kosher meals also have less sodium than the frozen kosher meals previously provided.  *Id.*  Mr. Friedman routinely eats the same shelf stable meals when he travels and when at home.  Dkt. 307-5, p. 42, ¶ 14.  In his opinion, they are certainly edible. *Id.*

The 2008 kosher diet menu also removed the hot breakfast.  Dkt. 307-2, p. 3, ¶ 8.  The hot breakfast was removed because it was not available as a shelf stable kosher meal and it was high in calories.  Its removal from the menu brought the kosher diet menu more in line with the mainline diet menu with regard to calories.  *Id.*

Offenders who choose to participate in religious fasts are provided with a "fast bag" to break the fast.  Dkt. 307-2, p. 3, ¶ 9.  A "fast bag" is made up to be equivalent to the lunch meal the offender would have received on the day of the fast had he not been fasting.  *Id.*  In the community, it is the practice of Jewish people to eat a meal before a fast and a meal after the fast ends, without increasing the quantity of food to make up for meals not eaten while fasting.  Dkt.

REPORT AND RECOMMENDATION - 4

307-5, p. 42, ¶ 15.  In prisons, offenders are primarily dependant on prison food services to provide their meals and are usually unable to accomplish the same thing on their own because of standardized prison meal serving times, so "fast bags" are provided to replicate community practice.  *Id.*  Therefore, when one of the five daytime fasts begins prior to normal breakfast serving time, inmates are given a "fast bag" - generally with the prior evening's dinner meal - to be consumed before the fast begins.  *Id.*  When a daytime fast ends after normal dinner serving time, inmates are given a "fast bag" - generally during normal evening dinner serving time - to be consumed after the fast.  *Id.*  There are also two 25-hour fasts during summer months that begin shortly after normal dinner serving time, so it is not necessary for a "fast bag" to be given to inmates before the fast begins.  *Id.*  These procedures eliminate any need for additional food service staffing and meal preparation outside of normal working hours, any need for additional meal deliveries to segregation units, or other additional operational burdens.   Dkt. 307-2, pp. 3-4, ¶ 9; Dkt. 307-5, p. 42, ¶ 15.

The selection of the contents of the bags is necessarily based on what kosher supplies are available, on what will not easily spoil, and on what does not need to be heated outside of hours that kitchens are normally closed (and/or held in food warmers beyond acceptable duration). Dkt. 307-2, p. 4, ¶ 9; Dkt. 307-5, pp. 42-43, ¶ 16.  Based on Mr. Friedman's experience in institutional kosher food service preparation, he has learned that the easiest way to provide fast bags within such parameters is to utilize cold lunch style items.  Dkt. 307-5, p. 43, ¶ 16.  Mr. Friedman, therefore, recommended this to DOC food service administrators as being the best way to accommodate the need.  Dkt. 307-2, p. 4, ¶ 9; Dkt. 307-5, p. 43, ¶ 16.

The DOC uses software purchased through Computrition, Inc., to perform nutritional analyses of both the kosher and mainline diet menus.  Dkt. 307-2, p. 4, ¶ 10.  Computrition, Inc.

REPORT AND RECOMMENDATION - 5

provides "foodservice and nutrition management systems to the healthcare, hospitality, university, school foodservice, military and corrections industries."   Computrition, Inc. provides software that includes "menu planning, purchasing, inventory control, production planning, recipe management, forecasting, costing and control, nutrition labeling, automated HACCP and diet office management."   DOC staff enters the nutritional data into the Computrition, Inc. software by entering the menu by item and/or recipe and portion size to get the nutritional values for the menu.  Dkt. 307-2, p. 4, ¶ 10.  The data entered into the Computrition, Inc. software consists of recipes, products, and portion size for menu items.  *Id.*  The final product is the nutritional analysis (NA) for each menu.  *Id.*

According to Jay Jackson, the current Food Program Manager for DOC, the nutritional analysis for the 2004 kosher diet menu was completed on August 15, 2006.   Dkt. 307-2, pp. 2-6 (Attach. A - Nutritional Analysis dated 8/15/06 and 2004 kosher diet menu).  The nutritional analysis for the 2006 kosher diet menu was completed on May 18, 2006.  *Id.*, pp. 35-74 (Attach. B - Nutritional Analysis dated 5/18/06 and 2006 kosher diet menu).  The nutritional analysis for the 2008 kosher diet menu was completed on November 21, 2008.  Dkt. 307-3, pp. 2-33 (Attach. C - Nutritional Analysis dated November 21, 2008, and the 2008 kosher diet menu).  The nutritional analysis for the 2006 mainline menu was completed on May 19, 2006.   Dkt. 307-4, pp. 2-41, Attach. G - Nutritional Analysis dated May 19, 2006, and the 2006 mainline diet menu).  The nutritional analysis for the 2008 mainline menu was completed on December 23, 2008.  Dkt. 307-5, pp. 2-33 (Attach. H - Nutritional Analysis dated December 23, 2008, and the 2008 mainline diet menu).

The Department also provides a Passover menu for those offenders wishing to participate in Passover.  Dkt. 307-2, p. 5, ¶ 14.  Passover in 2004 lasted from April 6 to April 14, 2004.  *Id.*,

REPORT AND RECOMMENDATION - 6

¶ 16.  Passover in 2006 lasted from April 12 to April 20, 2006.  *Id.*, ¶ 15.  Passover in 2008 lasted from April 19 to April 27, 2008.  *Id.*, ¶ 14.  Minor changes were made to each menu annually, although the amount and type of food served did not change significantly.  Dkt. 307-3, pp. 35-44 (Attach. D - Nutritional Analysis dated January 3, 2008 and the 2008 Passover Menu); *Id.*, p. 46 (Attach. E - 2006 Passover Menu); *Id.*, p. 48 (Attach. F -2004 Passover Menu).

The DOC does not maintain copies of the nutritional analyses for the 2004 and 2006 Passover menus; however the 2008 Passover Menu, which was substantially similar to the 2004 and 2006 menus contained an average of 2,844 calories per day, and provided an average of 952 milligrams of calcium and an average of 267 international units of Vitamin D, per day.  Dkt. 307-2, pp. 5-6, ¶¶ 14-19, and Dkt. 307-3, pp. 35-44 (Attach. D).

The 2004 kosher diet menu contained daily averages of 2,380 calories, 1,000 milligrams of calcium, and 260 international units of Vitamin D.  Dkt. 307-2, p. 4, ¶ 11; pp. 8-33 (Attach. A).

The 2006 kosher diet menu contained daily averages of 2,490 calories, 896 milligrams of calcium, and 121 international units of Vitamin D.  Dkt. 307-2, p. 4, ¶ 12; pp. 35-74 (Attach. B).

The 2008 kosher diet menu contained daily averages of 2,910 calories, 995 milligrams of calcium, and 623 international units of Vitamin D.  Dkt. 307-2, p. 5, ¶ 13; Dkt. 307-3, pp. 2-33 (Attach. C).

The 2006 mainline diet menu contained daily averages of 3,011 calories, 1,011 milligrams, and 129 international units of Vitamin D.  Dkt. 307-2, pp. 5-6, ¶ 18; Dkt. 307-4, pp. 2-41 (Attach. G).

REPORT AND RECOMMENDATION - 7

The 2008 mainline diet menu contained daily averages of 2,922 calories, 1,320 milligrams of calcium, and 461 international units of Vitamin D.  Dkt. 307-2, p. 6, ¶ 19; Dkt. 307-5, pp. 2-33 (Attach. H).

Both the 2008 mainline and kosher diet menus provide for serving a fortified drink mix. Dkt. 307-2, p. 6, ¶ 20; Dkt. 307-3 (Attach. C) and Dkt. 307-5 (Attach. H).  The fortified drink mix served by the Department includes 250 milligrams of calcium, 140 international units of Vitamin D and 60 milligrams of Vitamin C per serving.  Dkt. 307-5, pp. 35-36 (Attach. I).

The caloric values of the mainline and kosher diet menus are determined on an average over the course of a week, month, or cycle.  Dkt. 307-2, p. 6, ¶ 21.  The daily calories fluctuate slightly, but an offender who consistently consumes the diet will receive the average calories.  *Id.* DOC policy requires that the mainline and kosher diet menus meet the standards identified by the Food and Nutrition Board of the National Research Council.  Dkt. 307-5, pp. 47-48 (Exh. 3 - Declaration of Dell-Autumn Witten); Attach. A, pp. 50-58 (DOC Policy 610.240, effective October 16, 2001; Attach. B, pp. 60-72 (DOC Policy 610.240, effective September 30, 2005; Attach. C, pp. 74-83 (DOC Policy 610.240, effective May 14, 2007) and Attach. D, pp. 85-96 (DOC Policy 240.100, effective April 10, 2009).  These standards recommend that adult men receive daily averages of 2,700 to 3,000 and 1,000 milligrams of calcium.  *Id.*

The menus are also evaluated using the recommendations of the Food and Drug Administration (FDA). The FDA guidelines recommend that an individual receive 1,000 milligrams of calcium and 400 international units of Vitamin D per day.  Dkt. 307-6, pp. 5-8 (Exh. 5 - Declaration of Diane Benfield); Attach. A, pp. 10-11 (FDA Guidelines).  Neither the FDA nor the Food and Nutrition Board of the National Research Council make any recommendation as to the amount of linoleic acid to be received.  *Id.*

REPORT AND RECOMMENDATION - 8

**B.      Defendants' Roles in Kosher and Mainline Menu Diets**

Defendant Jay Jackson has been the DOC's Food Program Manager since October 16, 2006.  Dkt. 307-2, p. 2, ¶ 1.  He oversees the creation and administration of the kosher and mainline diet menus.  *Id.* ¶ 2.  Defendant Jackson wrote the 2008 kosher and mainline diet menus to comply with operational needs, religious dietary law (as approved by Mr. Friedman), and the recommendations of the Food and Nutrition Board of the National Research Council and the FDA.  *Id.*  He states that did not create the 2008 kosher diet menu as a means of retaliating against Mr. Florer.  His goal was to create a religiously and nutritionally adequate kosher diet menu.  *Id.* ¶ 5.

From February 2000 until June 2006, Defendant Cheryl Bales was employed as DOC's Food Program Manager and statewide Registered Dietitian.  Dkt. 307-6, p. 2, ¶ 2 (Exh. 4 - Declaration of Cheryl Bales).  Defendant Bales oversaw the creation and administration of kosher and mainline diet menus and authored the 2004 and 2006 kosher diet menus, in conjunction with religious advisors.  *Id.*, ¶ 3.   She also authored the 2006 mainline diet.  *Id.*  As the DOC's Registered Dietitian, she verified the nutritional adequacy of the 2004 and 2006 kosher diet menus, as well as the nutritional adequacy of the 2006 mainline diet menu, consistent with the recommendations of the FDA.  *Id.*, pp. 2-3, ¶ 4.  Defendant Bales states that she did not create the 2004 and 2006 kosher diet menus as a means of retaliating against Mr. Florer.  Her goal was to create a religiously and nutritionally adequate kosher diet menu.  *Id.*, p. 3, ¶ 5.

Defendant Diane Benfield is a Registered Dietitian employed at the Washington State Penitentiary (WSP).  Dkt. 307-6, p. 5, ¶ 1 (Exh. 5 – Declaration of Diane Benfield).  Defendant Benfield has held this position since 1998.  *Id.*, p. 1, ¶ 1.  In the absence of a statewide Registered Dietitian, Defendant Benfield was asked to review the 2008 kosher and mainline diet

REPORT AND RECOMMENDATION - 9

1    menus for nutritional adequacy.  *Id.* ¶ 3.  Defendant Benfield verified the nutritional adequacy of

2    the 2008 kosher and mainline diets, consistent with the recommendations of the FDA.  *Id.*

3    **C.    Plaintiff's Physical Condition**

4           Mr. Florer is six feet tall.  Dkt. 307-5, p. 5, ¶ 4.  His ideal body weight, based on his

5    height is 160-196 pounds.  Dkt. 307-6, p. 33, ¶ 4 (Exh. 6 - Declaration of Brent Carney).  Ideal

6    body weight is the weight that people are expected to weigh based on age, sex, and height.  *Id.*, ¶

7    3.  Ideal body weight results in a Body Mass Index (BMI) of 19 - 26.4.  *Id.*  BMI is a number

8    calculated from a person's weight and height.  *Id.*  BMI provides a reliable indicator of body

9    fatness for most people and is used to screen for weight categories that may lead to health

10   problems.  *Id.*  The recommended BMI for a six foot tall male is a range between 19 and 26.4.

11   *Id.* ¶ 5.  Mr. Florer asserts that a healthy BMI range for a 6 foot person is 18.5 to 25.  Dkt. 323.2,

12   p. 14.  However, he believes that because he is 6 feet tall, with a 32" waist, with very little body

13   fat and substantial muscle mass, he is underweight.  *Id.*

14          Mr. Florer re-entered DOC custody on August 12, 2003.  *Id.*, p. 33, ¶ 5.  His weight

15   fluctuated between 164 and 185 pounds between 2004 and 2009.  Dkt. 307-6, p. 13 (Attach. B -

16   Chart of Plaintiff's Weight).  At 190 pounds, Mr. Florer's BMI was 25.8, within the normal

17   weight range.  Dkt. 307-6, p. 33, ¶ 5.  At 179 pounds, Mr. Florer's most common weight, his

18   BMI is 24.3, within the normal weight range.  *Id.*  At 164 pounds, Mr. Florer's lowest recorded

19   weight during his re-incarceration, his BMI was 22.3, within the normal weight range.  *Id.*

20          Mr. Florer asserts that his "usual" body weight is 185-190 pounds.  Dkt. 190, p. 29.

21   According to Cheryl Bales, "usual" body weight is a subjective term of art used by medical and

22   nutrition professionals.  Dkt. 307-6, p. 3, ¶ 6.  "Usual" body weight is determined by looking at

23   an individual's weight over a period of time (i.e. one month, six months, a year, etc.) and

1    determining the average.  *Id.*  Based on this standard calculation, Mr. Florer's "usual" body

2    weight was 166.6 pounds in 2004; 176.8 pounds in 2005; 181.5 pounds in 2006; 174 pounds in

3    2007; 173.5 pounds in 2008.  *Id.*

4            The Harris-Benedict Equation is an equation used by nutrition and medical professionals

5    to estimate an individual's daily caloric need.  Dkt. 307-6, p. 33, ¶ 6.  Daily caloric need is based

6    on age, weight, and activity level.  *Id.*  In 2004, when Mr. Florer was 38-years-old and weighed

7    164 pounds, his daily caloric need was 2,186 calories per day, assuming he had a moderate

8    activity level.  *Id.*, ¶ 7.  In 2004, if Mr. Florer weighed 190 pounds, his daily caloric need would

9    have been 2,389 calories, assuming he had a moderate activity level. *Id.*  In 2006, when Mr.

10   Florer was 40-years-old, and weighed 178 pounds, his daily caloric need was 2,279 calories,

11   assuming he had a moderate activity level.  *Id.*, ¶ 8.  In 2006, if Mr. Florer weighed 190 pounds,

12   his daily caloric need would have been 2,373 calories, assuming he had a moderate activity level.

13   *Id.*  In 2008, when Mr. Florer was 42-years-old and weighed 178 pounds, his daily caloric need

14   was 2,261 calories, assuming he had a moderate activity level.  *Id.*, pp. 33-34, ¶ 9.  In 2008, if

15   Mr. Florer weighed 190 pounds, his daily caloric need would have been 2,355 calories, assuming

16   he had a moderate activity level.  *Id.*, p. 34, ¶ 9.

17           The 2004, 2006, and 2008 kosher diet menus, which provided Mr. Florer with 2,380,

18   2,490, and 2,910 calories respectively, each provided Mr. Florer with more calories than his

19   estimated daily caloric need.  *See,* Dkt. 307-2, p. 4, ¶ 11; pp. 8-33 (Attach. A); Dkt. 307-2, p. 4, ¶

20   12; pp. 35-74 (Attach. B); and, Dkt. 307-2, p. 5, ¶ 13; Dkt. 307-3, pp. 2-33 (Attach. C).

21           The 2006 and 2008 mainline diet menus, which provided Plaintiff with 3,011 and 2,922

22   calories respectively, each provided Plaintiff with more calories than his estimated daily caloric

REPORT AND RECOMMENDATION - 11

needs.  *See* Dkt. 307-2, pp. 5-6, ¶ 18; Dkt. 307-4, pp. 2-41 (Attach. G); Dkt. 307-2, p. 6, ¶ 19; Dkt. 307-5, pp. 2-33 (Attach. H).

On December 3, 2004, it was reported to medical staff, by Intensive Management Unit staff, that Mr. Florer had not consumed five meals provided to him.  Dkt. 307-6, p. 6, ¶ 6; Attach. C, p. 15 (Primary Encounter Report dated 12/2/04 through 12/3/04).  On April 16, 2006, Mr. Florer's medical file documents that he was "refusing to eat."  Dkt. 307-6, p. 6, ¶ 7; Attach. D, pp. 17-18 (Primary Encounter Report dated 12/13/05 through 8/30/06).  Also on April 16, 2006, Mr. Florer reported having missed nine consecutive meals.  Dkt. 307-6, p. 6, ¶ 7; Attach. D. When asked why he was missing meals, he stated, "that's for the attorney general."  *Id.*  Mr. Florer asserts that he did not eat because he was given non-kosher meals during Passover.  Dkt. 323-3, pp. 20-21.

Mr. Florer complains of hunger pains, hot and cold flashes, stomach cramps, a low energy level, and weight loss.  Mr. Florer has sought no medical treatment for these complaints. Dkt. 307-6, p. 6, ¶ 8.[3]

On December 6, 2004, Mr. Florer complained to medical staff that he felt "weak" due to lack of food and weight loss.  Dkt. 307-6, p. 6, ¶ 9; Attach. E, p. 20 (Primary Encounter Report dated 12/6/04 through 12/9/04).  The nurse practitioner who evaluated him noted that his ideal body weight was "149-188" and that his weight on that date was "167 lb."  Attach. E, p. 20.  The nurse practitioner stated, "weight within desirable range."  *Id.*

On December 10, 2004, Mr. Florer asked for a dietary supplement.  Dkt. 307-6, pp. 6-7, ¶ 10; Attach. F, p. 22 (Primary Encounter Report dated 12/10/04 through 12/15/04).  As a result,

---

[3] Mr. Florer refers to blood pressure readings of 100/58 in February 2000 and 136/84 in October  2007; an x-ray showing degenerative changes in his hips; and, a fracture in his hand in July 2007.  The relevancy of these records to the issues at hand is not documented.

REPORT AND RECOMMENDATION - 12

1   he was scheduled for weekly weigh-ins to assess his weight loss patterns. *Id.* Over the next six

2   months, Mr. Florer gained weight, increasing his weight from 168 pounds on December 27, 2004

3   to 184 pounds on June 10, 2005.  Dkt. 307-6, p. 7, ¶ 10; Attach. B, p. 13.

4           On May 4, 2005, Plaintiff complained to medical staff that he was hungry and wanted

5   more food.  Dkt. 307-6, p. 7, ¶ 12; Attach. G, p. 24 (Primary Encounter Report dated 5/4/05

6   through 5/9/05).   Mr. Florer was asked to address his concerns to his medical provider.  *Id.*

7           On May 12, 2005, Mr. Florer requested of medical staff that he be provided extra food.

8   Dkt. 307-6, p. 7, ¶ 12; Attach. H, p. 26 (Primary Encounter Report dated 5/12/05 through

9   6/1/05).  The physician's assistant who evaluated Mr. Florer stated, "There continues to be NO

10  medical need for extra food." *Id.* (emphasis in original).

11          On June 16, 2005, Mr. Florer complained to the dietitian of hunger.  Dkt. 307-6, p. 7, ¶

12  13; Attach. I, p. 28 (Primary Encounter Report dated 6/16/05 through 7/1/05).  The dietitian who

13  evaluated him determined that his ideal body weight was "178 ± 10%" and that his caloric needs

14  to maintain his weight with low activity was about —2,200 kcal daily".  Dkt. 307-6, p. 28.  The

15  dietitian also stated, "meeting nutritional needs via kosher diet at this time." *Id.*

16          On October 10, 2007, Mr. Florer reported to medical staff that he was "fatigued" as a

17  result of not having water.  Dkt. 307-6, p. 7, ¶ 14; Attach. J, p. 30 (Primary Encounter Report

18  dated 10/10/07 through 10/24/07).

19          Since October 11, 2007, Mr. Florer has sought no medical treatment for hunger pains, hot

20  and cold flashes, stomach cramps, a low energy level, or weight loss.  Dkt. 307-6, p. 8, ¶ 15.

21                              **SUMMARY JUDGMENT STANDARD**

22          Summary judgment will be granted when there is no genuine issue as to any material fact

23  and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The party

REPORT AND RECOMMENDATION - 13

seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those positions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).

Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Calderone v. United States*, 788 F.2d 254, 259 (6th Cir. 1986). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the non-moving party's case. *Celotex*, 477 U.S. at 325. If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. *Anderson v. Liberty Lobby*, 477 U.S. 242, 250, 106 S. Ct. 2502, 91 L.Ed.2d 202 (1986). The party opposing the motion must do more than simply show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). "A plaintiff's belief that a defendant acted from an unlawful motive, without evidence supporting that belief, is no more than speculation or unfounded accusation about whether the defendant really did act from an unlawful motive." *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1028 (9th Cir. 2001).

The Ninth Circuit has expressly stated that "[n]o longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment. *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987), *cert. denied*, 484 U.S. 1006 (1988). A plaintiff cannot rest upon the allegations in his complaint, but must establish each element of his claim with "significant probative evidence

REPORT AND RECOMMENDATION - 14

tending to support the complaint." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n.*, 809 F.2d 626, 630 (9th Cir. 1980). A party opposing a motion must present facts in evidentiary form and cannot rest upon the pleadings. *Anderson*, 477 U.S. 242. Genuine issues of material fact are not raised by conclusory or speculative allegations. *Lujan*, 497 U.S. 871. The purpose of summary judgment is not to replace conclusory allegations in pleading form with conclusory allegations in an affidavit. *Lujan*, 497 U.S. at 888; *cf. Anderson*, 477 U.S. at 249. Bare assertions unsupported by evidence do not preclude summary judgment. *California Architectural Bldg. Prods., supra.*

## DISCUSSION

**A.     Eighth Amendment – Nutritional Adequacy of Kosher and Mainline Menus**

Inmates alleging Eighth Amendment violations based on prison conditions must demonstrate that prison officials were deliberately indifferent to their health or safety by subjecting them to a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970(1994); *Wallis v. Baldwin*, 70 F.3d 1074, 1076 (9th Cir. 1995). Prison officials display a deliberate indifference to an inmate's well-being when they consciously disregard an excessive risk of harm to the inmate's health or safety. *Farmer*, 511 U.S. at 838-40; *Wallis*, 70 F.3d at 1077.

The Eighth Amendment standard requires proof of both the objective and subjective component. *Hudson v. McMillian*, 503 U.S. 1, 112 S. Ct. 995(1992). First, the deprivation alleged must objectively be sufficiently serious, resulting in a denial of the "minimal civilized measures of life's necessities." *Farmer*, 511 U.S. at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S. Ct. 2392(1981)). In proving the objective component, an inmate must establish that there was both some degree of actual or potential injury, and that society considers the [acts]

REPORT AND RECOMMENDATION - 15

that the plaintiff complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly [to those acts].  *Helling v. McKinney*, 509 U.S. 25, 36, 113 S. Ct. 2475(1993); *see also Estelle v. Gamble*, 429 U.S. 97, 102, 97 S. Ct. 285(1976).  The subjective component requires proof that the prison official possesses a sufficiently culpable state of mind: "deliberate indifference to inmate health and safety."  *Farmer*, 511 U.S. at 834-36.  With regard to deliberate indifference, a prison official is not liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id.*, at 837.  The subjective component requires proof that the official was (1) aware of the facts that would lead a reasonable person to infer the substantial risk of serious harm; (2) actually made the inference that the substantial risk of serious harm to the plaintiff existed; and (3) knowingly disregarded the risk.  *Id.*  The Court in *Farmer* explained:

> [p]rison officials charged with deliberate indifference might show, for example, that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent. In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.

*Farmer*, 511 U.S. at 844.  If either of these components is not established, the court need not inquire as to the existence of the other.  *Helling*, 509 U.S. at 35.

"[T]he State must provide an inmate with a 'healthy habilitative environment[,]' [that] includes providing nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it."  *Ramos v. Lamm,* 639 F.2d 559, 570-71 (10th Cir.1980).  While "a lack of

REPORT AND RECOMMENDATION - 16

sanitation that is severe or prolonged can constitute an infliction of pain within the meaning of the Eighth Amendment," *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000) *quoting Anderson v. County of Kern*, 45 F.3d 1310, 1314, *as amended*, 75 F.3d 448 (9th Cir.1995), "[t]he Eighth Amendment requires only that prisoners receive food that is adequate to maintain health; it need not be tasty or aesthetically pleasing." *Cunningham v. Jones*, 567 F.2d 653, 659-60 (6th Cir.1977).  "The fact that the food occasionally contains foreign objects or sometimes is served cold, while unpleasant, does not amount to a constitutional deprivation." *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir.1985), *cert. denied*, 475 U.S. 1096, 106 S. Ct. 1492, 89 L.Ed.2d 894 (1986), *LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir.1993).

Only those conditions of confinement that deny a prisoner "the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Id. quoting Hudson v. McMilliam*, 503 U.S. 1, 112 S. Ct. 995, 1000, 117 L. Ed. 2d 156 (1992)).

Mr. Florer complains that the kosher and mainline diet menus were written to comply with the Food and Nutrition Board and Food and Drug Administration guidelines rather than the Dietary Guidelines, which he claims are based on "objective verifiable scientifically verifiable principles subject to peer review and publication." *See, e.g.*, Dkt. 323-2, pp. 2-4.  There is, however, no legal requirement that DOC menus be based on the dietary guidelines preferred by Mr. Florer.  Conversely, it is undisputed that the statewide mainline and kosher diet menus were created with all offenders in mind.  Dkts. 307-2 (Exh. 1) and 307-6 (Exh. 4).  It is also uncontroverted that the caloric values of the mainline and kosher diet menus meet the standards identified by the Food and Nutrition Board of the National Research Council and the FDA and DOC policy requires that their menus meet those standards.  Dkt. 307-5, pp. 47-48 (Exh. 3 -

REPORT AND RECOMMENDATION - 17

Declaration of Dell-Autumn Witten); Attach. A, pp. 50-58 (DOC Policy 610.240, effective

October 16, 2001; Attach. B, pp. 60-72 (DOC Policy 610.240, effective September 30, 2005;

Attach. C, pp. 74-83 (DOC Policy 610.240, effective May 14, 2007) and Attach. D, pp. 85-96

(DOC Policy 240.100, effective April 10, 2009).  These standards recommend that adult men

receive daily averages of 2,700-3,000 calories, 1,000 milligrams of calcium, and 400

international units of Vitamin D.  Dkt. 307-6, pp. 5-8 (Exh. 5 - Declaration of Diane Benfield);

Attach. A, pp. 10-11 (FDA Guidelines).  There is no recommendation for the amount of linoleic

acid to be received daily by the Food and Nutrition Board of the National Research Council or

the FDA.  *Id.*

> 1)      **2004, 2006, and 2008 Kosher Diet Menus**

While consuming the 2004 kosher diet menu, Mr. Florer never dropped below 160

pounds or went above 196 pounds.  Dkt. 307-6 (Exh. 5, ¶ 5).  According to the results of the

Harris-Benedict equation, in 2004 at 164 pounds, Mr. Florer needed an estimated 2,186 calories

per day.  *Id.* ¶ 7.  If Mr. Florer had weighed 190 pounds in 2004, his professed "usual" body

weight, he would have needed an estimated 2,389 calories per day.  The 2004 kosher diet menu

provided Mr. Florer with an average of 2,380 calories per day.  Dkt. 307-2, Attach. A, pp. 8-33.

While consuming the 2006 kosher diet menu, Mr. Florer never dropped below 160

pounds or went above 196 pounds.   Dkt. 307-6 (Exh. 5, ¶ 5).  According to the results of the

Harris-Benedict equation, in 2006 at 178 pounds, Mr. Florer needed an estimated 2,279 calories

per day.  *Id.* ¶ 8.  If Mr. Florer had weighed 190 pounds in 2006, his professed "usual" body

weight, he would have needed an estimated 2,373 calories per day.   The 2006 kosher diet menu

provided Mr. Florer with an average of 2,490 calories per day.  Dkt. 307-2, Attach. B, pp. 35-74.

REPORT AND RECOMMENDATION - 18

1    While consuming the 2008 kosher diet menu, Mr. Florer never dropped below 160

2    pounds or went above 196 pounds.  Dkt. 307-6 (Exh.  5, ¶ 5).  According to the results of the

3    Harris-Benedict equation, in 2008 at 178 pounds, Mr. Florer needed an estimated 2,261 calories

4    per day.  *Id.* ¶ 9.  If Mr. Florer had weighed 190 pounds in 2008, his professed "usual" body

5    weight, he would have needed an estimated 2,355 calories per day.  *Id.*  The 2008 kosher diet

6    menu provided Mr. Florer with an average of 2,910 calories per day.  Dkt. 307-2, Attach. C, pp.

7    2-33.  Additionally, the 2008 kosher diet menu met the recommended nutritional requirements of

8    the FDA for Vitamin D, although it contained, on average 5 milligrams of calcium less than that

9    recommended by the FDA.  Dkt. 307-2.

10

11    Mr. Florer apparently believes that the 2004, 2006, and 2008 kosher diet menus do not

12    meet United States Department of Agriculture (USDA) recommendations for certain nutrients

13    and that they are, therefore, nutritionally inadequate.  He claims that the kosher menus are

14    lacking in certain nutrients, such as potassium, calcium, linoleic acids, fiber and vitamin D.  Dkt.

15    323-2, pp. 5-9.  The USDA guidelines and recommendations are not constitutional requirements.

16    The Eighth Amendment requires only that prisoners receive food that is adequate to maintain

17    health; food need not be tasty or aesthetically pleasing.  *Lemaire*, 12 F.3d at 1456.  The summary

18    judgment evidence here demonstrates that the food provided to Mr. Florer has been sufficient to

19    maintain his health.  Mr. Florer has offered no evidence to the contrary.  There is no evidence

20    that the 2004, 2006, and 2008 kosher diets deprive Mr. Florer of "the minimal civilized measure

21    of life's necessities".  *Lemaire*, 12 F.3d at 1456 (quoting *Hudson*, 503 U.S. 1).

22

23    Mr. Florer also asserts that his caloric needs are higher because he engages in "moderate"

24    daily activity.  Dkt. 323-2, p. 18.  Mr. Florer uses the "Harris-Benedict" equation using a 1.7

25    multiplier to account for the amount of energy expended, including "walking 3.5 mph – 4.0 mph,

26

REPORT AND RECOMMENDATION - 19

weeding and hoeing, carrying a load, cycling, skiing, tennis dancing". *Id.*; Dkt. 363, Attachs. F, W.  Conversely, Mr. Florer also states that he lives in a prison cell 24 hours a day and "cannot participate in physical activity."  Dkt. 323-2, pp. 13, 15.

Regardless of the inconsistency in his claims and assuming that Mr. Florer is entitled to maintain his ideal weight of 190 pounds and engage in daily moderate activity, the evidence presented here indicates that his daily caloric needs were being met.  And, although he claims hunger pangs and stomach cramps, these are unspecified and undocumented.  Mr. Florer has never sought medical treatment, his sporadic requests for food over a six year period have never been based on a medical need, and his weight has never dropped below the minimum health weight for a man of his size.

Mr. Florer also asserts that the frozen and shelf meals are "inedible".  Dkt. 323-12.  He does not, however, dispute that the frozen and shelf meals are kosher and meet the requirements of Jewish Dietary laws.  Dkt. 323-3.  There is no constitutional requirement that the meals be subjectively "tasty."  The evidence also reflects that both the frozen kosher meals served on the 2004 and 2006 kosher diet menus and the shelf stable kosher meals served on the 2008 kosher diet menu are eaten by Jewish people in the community on a regular basis and are considered "certainly edible".  Dkt. 307-5, ¶ 14.  Therefore, there is no basis for a claim as to the nutritional value of these menus.

The record contains evidence that the kosher diet menus provided Mr. Florer with sufficient calories and nutrients to sustain him and to maintain his health.   Accordingly, the undersigned recommends that Mr. Florer's Eighth Amendment claims regarding the nutritional value of the 2004, 2006, and 2008 kosher diet menus be dismissed.

REPORT AND RECOMMENDATION - 20

2)  **2004, 2006, And 2008 Passover Menus**

The record reflects that the 2004, 2006, and 2008 Passover menus are not significantly different from one another.  While consuming the 2008 Passover menu, Mr. Florer never dropped below 160 pounds or went above 196 pounds.  Dkt. 307-6 (Exh. 5, ¶ 5).  According to the results of the Harris-Benedict equation, in 2008 at 178 pounds, Mr. Florer needed an estimated 2,261 calories per day; and, if he had weighed 190 pounds, he would have needed about 2,355 calories per day.  *Id.* ¶ 9.  He received an average of 2,844 calories per day on the 2008 Passover menu.  Dkt. 307-2, Attach. D, pp. 35-44.  The 2008 Passover menu also provided 953 milligrams of calcium and 267 international units of Vitamin D daily.  Although it contained, on average, less calcium and Vitamin D than the recommended amount by the FDA.  At most, however, Mr. Florer received the Passover menu only on fast days and "fast bags" are used only on the seven annual fast days to break the fast, not to replace the calories or nutrients not consumed during fasting.  Dkt. 307-2, p. 3, ¶ 9.

Mr. Florer has provided no competent summary judgment evidence on which it may be concluded that the Passover menu deprived him of sufficient calories and nutrients to sustain him and maintain his health.  Accordingly, the undersigned recommends that Defendants' motion for summary judgment on Mr. Florer's Eighth Amendment claims relating to the 2004, 2006 and 2008 Passover Menus be granted.

**B. RLUIPA and First Amendment – Religious Adequacy of Menus**

Mr. Florer makes his claims under both the First Amendment and RLUIPA.  To satisfy a First Amendment religious claim, a plaintiff "must show the [defendant] burdened the practice of [his] religion, by preventing him from engaging in conduct mandated by his faith, without any justification reasonably related to legitimate penological interests."  *Freeman v. Arpaio*, 125 F.3d

REPORT AND RECOMMENDATION - 21

1   732, 735 (9th Cir. 1997) (citing *Turner v. Safley*, 482 U.S. 78, 89, 107 S. Ct. 2254 (1987).  "In

2   order to reach the level of a constitutional violation, the interference with one's practice of

3   religion must be more than an inconvenience; the burden must be substantial and an interference

4   with a tenet or belief that is central to religious doctrine." *Freeman*, 125 F.3d at 737 (citing

5   *Graham v. C.I.R.*, 822 F.2d 844, 851 (9th Cir. 1987)).

6          RLUIPA provides that:

7

8          No government shall impose a substantial burden on the religious exercise of a
           person residing in or confined to an institution … even if the burden results from

9          a rule of general applicability, unless the government demonstrates that
           imposition of the burden on that person—

10

11         (1)      is in furtherance of a compelling governmental interest; and

12         (2)      is the least restrictive means of furthering that compelling governmental
                    interest.

13

14   42 U.S.C. § 2000cc-1(a).

15          Under RLUIPA, plaintiff "bears the initial burden of going forward with evidence to

16   demonstrate a prima facie claim that the challenged state action constitutes a substantial burden

17   on the exercise of his religious beliefs." *Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir.

18   2005) (citing *Cutter*, 125 S. Ct. at 2119).  "[A] burden is substantial under RLUIPA when the

19   state denies [an important benefit] because of conduct mandated by religious belief, thereby

20   putting substantial pressure on an adherent to modify his behavior and to violate his beliefs."

21   *Shakur v. Schriro*, 514 F.3d 878, 888 (9th Cir. Jan. 23, 2008) (internal quotes omitted).  A

22   prison's "accommodation of religious observances" should not be elevated "over an institution's

23   need to maintain order and safety." *Cutter v. Wilkinson*, 544 U.S. 709, 722, 125 S. Ct. 2113

24   (2005).  On the contrary, "an accommodation must be measured so that it does not override other

25

26

REPORT AND RECOMMENDATION - 22

1    significant interests." *Id.*  Furthermore, "prison security is a compelling state interest, and …

2    deference is due to institutional officials' expertise in this area." *Id.* at 2124 n.13.

3            RLUIPA provides greater protection than the First Amendment by protecting activities

4    that an offender sincerely believes are central to his religion, rather than just those activities

5    which are central to his religion as determined by the tenets of that religion.  A policy which

6    passes constitutional scrutiny may not pass scrutiny under RLUIPA, however, if a policy

7    survives the RLUIPA analysis, it survives the First Amendment analysis.

8            Mr. Florer does not dispute that he received a kosher diet and that the 2004, 2006, and

9    2008 kosher menus, including the kosher premade dinners and fast bags, all complied with

10   Jewish dietary laws.  Dkt. 323-2, p. 21.  He argues, however, that Defendants interfered with his

11   ability to practice his religion because they served him with kosher food that was nutritionally

12   inadequate (because it lacked calories and certain nutrients) and because it was inedible.  *Id.*, p.

13   24.  As noted above, the evidence does not support Mr. Florer's claims that the menus were

14   nutritionally inadequate.

15           Viewing the evidence in the manner most favorable to Mr. Florer, the undersigned finds

16   that the Defendants did not substantially interfere with Mr. Florer's ability to freely exercise his

17   religion.  There was no denial of any benefit – here, the kosher meals.  In fact, as acknowledged

18   by Mr. Florer, he was given meals complying with kosher dietary laws whenever he asked for

19   them.  His belief that the meals should have contained higher calories or percentages of nutrients

20   to meet his personal needs is not relevant to whether the menus complied with religious and

21   nutritional requirements.  Thus, the undersigned recommends that Defendants' motion for

22   summary judgment on Mr. Florer's claims under the First Amendment and RLUPIA be granted.

REPORT AND RECOMMENDATION - 23

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**C.      The 2006 And 2008 Mainline Diets**

The evidence reflects that the 2006 and 2008 mainline diets were also nutritionally

adequate to maintain Mr. Florer's health.  The 2006 mainline diet menu provided daily averages

of 3,011 calories and 1,011 milligrams of calcium.  Dkt. 307-4 (Attach. G., pp. 2-41).  The 2008

mainline diet menu provided daily averages of 2,922 calories and 1,320 milligrams per day.  Dkt.

307-5 (Attach. H., pp. 2-33).  The Food and Nutrition Board of the National Research Council

recommends that adult males receive between 2,700 and 3,000 calories and 1,000 milligrams of

calcium per day.  Dkt. 307-5 (Attach. A, pp. 50-58; Attach. B, pp. 60-72; Attach. C, pp. 74-83;

Attach. D, pp. 85-96); Dkt. 307-6 (Attach. A, pp. 10-11).  Therefore, Mr. Florer's claim that the

menus are deficient in calcium is not supported by the evidence.

Mr. Florer also raises concerns about the use of a fortified fruit drink in lieu of milk on

the 2008 mainline and kosher diet menus. The evidence reflects that the fortified fruit drink

provides 250 milligrams of calcium similar to milk and provides additional Vitamin D and

Vitamin C. Dkt. 307-2 (Attach. I, pp. 35-36).   Thus, Mr. Florer has failed to demonstrate that

the use of a fortified fruit drink is a change so grave that it "violates contemporary standards of

decency to expose anyone unwillingly [to those acts]".  *Helling*, 509 U.S. at 36; *see also Estelle*,

429 U.S. at 102.

Mr. Florer also alleges that the mainline diets are deficient in Vitamin D.  However, the

evidence reflects that the 2006 mainline diet menu provided an average of 129 international units

of Vitamin D per day and the 2008 mainline diet menu provided an average of 461 international

units of Vitamin D per day.  Dkt. 307-4 (Attach. G, pp. 2-41); Dkt. 307-5 (Attach. H, pp. 2-33).

The Food and Nutrition Board of the National Research Council does not make a

recommendation as to how much Vitamin D a person should receive on average per day.  Dkt.

REPORT AND RECOMMENDATION - 24

307-5 (Attach. A, pp. 50-58; Attach. B, pp. 60-72; Attach. C, pp. 74-83; Attach. D, pp. 85-96). The FDA recommends that a person receive 400 international units of Vitamin D daily. Dkt. 307-6 (Attach. A, pp. 10-11).  Mr. Florer has failed to demonstrate that providing him 129 international units or 461 international units of Vitamin D on a daily basis is a denial so grave that it "violates contemporary standards of decency to expose anyone unwillingly [to those acts]".  *Helling*, 509 U.S. at 36; *see also Estelle*, 429 U.S. at 102.  There is also no evidence that Mr. Florer has suffered any injury associated with a Vitamin D deficiency and the injuries of which he does complain are not associated with a Vitamin D deficiency nor have they been substantiated.  Dkt. 307-6, ¶ 7;  Dkt. 307-6 (Exh. 6, ¶ 10).

Mr. Florer has provided no competent summary judgment evidence on which it may be concluded that the 2006 and 2008 Mainline Diet Menus deprived him of sufficient calories and nutrients to sustain him and maintain his health.  Accordingly, the undersigned recommends that Defendants' motion for summary judgment as to Mr. Florer's Eighth Amendment claims relating to the 2006 and 2008 Diet Menus be granted.

**D.    Retaliation**

A plaintiff can establish that his First Amendment rights have been adversely affected by retaliatory conduct only when the plaintiff shows: (1) that the plaintiff was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of plaintiff's constitutional rights.  *Mendocino Environmental Center v. Mendocino County*, 192 F.3d 1283, 1300-01 (9th Cir. 1999).   Challenges to institutional restrictions that are

asserted to inhibit First Amendment interests must also be analyzed in terms of the legitimate

policies and goals of the corrections system.  *Pell v. Procunier*, 417 U.S. 817 (1974).

Mr. Florer has a clearly established right to be free of retaliation for exercising his first

amendment rights.  See *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989);

*Carepartners LLC v. Lashway*, 545 F.3d 867, 877 (9th Cir. 2008).  However, as explained

below, the evidence before the court does not support Mr. Florer's claim that any defendant

retaliated against him because he was exercising his First Amendment rights.

In order to prevail on a First Amendment retaliation claim, a plaintiff must initially show

the protected conduct was a substantial or motivating factor in the defendant's decision.

*Carepartners*, 545 F.3d at 877.  If the plaintiff makes this initial showing, the burden shifts to

the defendant to establish that it would have reached the same decision even in the absence of

the protected conduct.  *Id*.  To meet this burden, a defendant must show by a preponderance of

the evidence that it would have reached the same decision; it is insufficient to show merely that

it could have reached the same decision. *Id*.

Mr. Florer claims that Defendants retaliated against him because of his religious beliefs

when they wrote the 2004 and 2006 Kosher menus to include non-consumable nutritionally

inadequate premade dinners and removed calories, breakfast and milk products from the 2008

Kosher menu.  Dkt. 190, p. 31.  The claim is nonsensical.  It is uncontroverted that the *statewide*

menus were written for all prisoners in compliance with DOC policy, FDA recommendations

and Kosher dietary laws.  There is no evidence that the menus were written in direct response to

Mr. Florer's religious practices.[4]  Therefore, Mr. Florer can show no retaliatory animus or intent

---

[4] Mr. Florer also fails to demonstrate how the addition of a fortified fruit drink, the use of shelf stable kosher meals, and the removal of the hot breakfast were changes that were made in the statewide menus in retaliation against him for engaging in constitutional activity, rather than for legitimate penological purposes.

REPORT AND RECOMMENDATION - 26

1  by any defendant.  Moreover, as noted above, the summary judgment evidence establishes that

2  the menus are nutritionally adequate.

3        Accordingly, the undersigned recommends that Defendants' motion for summary

4  judgment on Mr. Florer's retaliation claims be granted.

5  **E.    Damages Under RLUIPA**

6

7        Mr. Florer sues Defendants in their official and individual capacities.  However, all of the

8  Defendants are state employees and therefore, any judgment against them in their official

9  capacities would be paid by the State of Washington.  *See* RCW 4.92.075.  The Eleventh

10  Amendment bars Mr. Florer's suit for official-capacity damages under RLUIPA.  *Holley v.*

11  *California Department of Corrections, et al.*, 599 F.3d 1108, 1113-1114 (9th Cir. 2010).

12        Defendants also argue that Mr. Florer's suit for individual-capacity damages under

13  RLUIPA is barred.  Dkt. 327, p. 13.  Although the Ninth Circuit has not addressed the issue of

14  whether RLUIPA claims can be brought against State officials in their individual capacity, this

15  court is persuaded by the reasoning of the Eleventh Circuit holding that state officials sued as

16

17  individuals are not liable for money damages under RLUIPA.

18        RLUIPA creates a cause of action for suits against "a government"; government is

19  defined as "(i) a State, county, municipality, or other governmental entity created under the

20  authority of a State; (ii) a branch, department, agency, instrumentality, or official of an entity

21  listed in [that] clause ...; and (iii) any other person acting under color of state law ...."  42 U.S.C.

22  § 2000cc-5.  This language appears to create a right against state actors in their individual

23  capacities and it even mirrors the "under color of" language in § 1983.  *Sossamon v. Lone Star*

24  *State of Texas,* 560 F.3d 316, 327-28 (5th Cir. 2009).

25

26

REPORT AND RECOMMENDATION - 27

The Ninth Circuit has held that RLUIPA is constitutional under the Spending Clause. *Mayweathers v. Newland*, 314 F.3d 1062, 1066-70 (9th Cir.2002).   The Eleventh Circuit noted that Congress passed RLUIPA pursuant to its spending power under Article I of the Constitution and reasoned that federal statutes enacted under the spending power, which condition receipt of federal funds on a state's adherence to certain conditions, cannot subject a non-recipient of federal funds, such as a state official acting in his individual capacity, to private liability for damages. *Smith v. Allen*, 502 F.3d 1255, 1272-1273 (11th Cir.2007).   Therefore, the court concluded that as spending power legislation, RLUIPA cannot reach state officials in their individual capacities. *Id*. at 1273, 1275.

The Fifth and Seventh Circuits have also held that RLUIPA does not create a cause of action for damages against individuals because RLUIPA was passed pursuant to Congress's spending clause power.  *See Sossamon,* 560 F.3d at 328-29 (5th Cir. 2009) and *Nelson v. Miller*, 570 F.3d 868, 889 (7th Cir.2009).

The Fifth Circuit concluded that RLUIPA was passed pursuant to the Spending Clause and therefore, at least as to the claim before it, RLUIPA does not exist for individual-capacity damage claims. *Sossamon*, 560 F.3d at 328-29.  Likewise, the Seventh Circuit reasoned that "[c]onstruing RLUIPA to provide for damages actions against officials in their individual capacities would raise serious questions regarding whether Congress had exceeded its authority under the Spending Clause," and so the court declined to read RLUIPA as allowing damages against defendants in their individual capacities.  *Nelson*, 570 F.3d at 889.

However, the Fifth and Eleventh Circuits also noted that RLUIPA purports to contain a Commerce Clause underpinning (citing 42 U.S.C. § 2000cc-1(b) (RLUIPA will also apply whenever "the substantial burden affects ... commerce with foreign nations, among the several

REPORT AND RECOMMENDATION - 28

1   States, or with Indian tribes")), and thus, it is less clear whether RLUIPA should be construed as

2   further providing a cause of action against individual defendants who have been sued in their

3   individual capacities.  The *Smith* court reasoned, however, that "it is clear that the 'contracting

4   party' in the RLUIPA context is the state prison institution that receives federal funds."  Thus, it

5   is the institutions "that agree to be amenable to suit as a condition to receiving funds," not their

6   individual employees, who "are not 'recipients' of federal funds as we have construed that

7   term.'"  *Smith*, 520 F.3d at 1274-1275 (internal citations and footnotes omitted).

8

9        The Seventh Circuit also noted RLUIPA's Commerce Clause "underpinnings," but

10  concluded that it would be appropriate to interpret RLUIPA as an exercise of Congress's power

11  under the Spending Clause where, as in the case before it, there was no evidence before it that

12  "[the] denial of a religious diet 'affect[ed] ... commerce with foreign nations, among the several

13  States, or with Indian tribes.'"  *Id.*  *Nelson*, 570 F.3d at 886 (citing *Smith*, 502 F.3d at 1274 n. 9

14  (reasoning that RLUIPA should be analyzed as an exercise of Congress's Spending Clause

15  authority when there is no evidence of an effect on interstate or international commerce));

16  *Sossamon*, 560 F.3d at 328 n. 34 (same).

17

18       Here, the court agrees that it is appropriate to interpret RLUIPA as an exercise of

19  Congress's spending clause power.  In addition, there is no evidence of an effect on interstate or

20  international commerce by an alleged denial of a nutritionally or religiously adequate diet to

21  indicate that RLUIPA should be interpreted under the Commerce Clause.  Therefore, the

22  undersigned finds persuasive the reasoning of the Fifth and Eleventh Circuits in concluding that

23

24

25

26

REPORT AND RECOMMENDATION - 29

individual Defendants cannot be held liable in their individual capacities in an action under

RLUIPA.[5]

Accordingly, the undersigned recommends that Defendants' motion for summary

judgment on Mr. Florer's claim for damages under RLUIPA be granted.

**F.    Qualified Immunity**

Defendants contend that they are entitled to qualified immunity as to Mr. Florer's

constitutional claims.  "Qualified immunity is 'an entitlement not to stand trial or face the other

burdens of litigation.'"  *Saucier v. Katz*, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272

(2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)).

The court evaluates a defendant's qualified immunity defense using a two-step inquiry.  *Id*.

However, the Supreme Court recently held that this two-step inquiry is no longer an inflexible

requirement.  *Pearson v. Callahan*, ---U.S. ---, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009)

(explaining "that, while the sequence set forth [in *Saucier*] is often appropriate, it should no

longer be regarded as mandatory").  It is within our "sound discretion in deciding which of the

two prongs of the qualified immunity analysis should be addressed first in light of the

circumstances in the particular case at hand."  *Id*.

Under *Saucier's* first prong, the court must determine whether, viewing the facts in the

light most favorable to the plaintiff, the government employees violated the plaintiff's

constitutional rights.  *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151.  If the court determines that a

constitutional violation has occurred, under *Saucier's* second prong, it must determine whether

the rights were clearly established at the time of the violation.  *Id*.  For a right to be clearly

---

[5] Two district courts in our circuit also relied on the Eleventh Circuit's holding in *Smith* that state officials being sued as individuals have qualified immunity from RLUIPA.  *See Shilling v. Crawford*, 536 F.Supp.2d 1227, 1234 (D. Nev. 2008); *Brown v. Vail, et al.*, No. CV-08-5091-JPH (E.D. Wash. Jul. 28, 2009 (order on motion to dismiss).

REPORT AND RECOMMENDATION - 30

established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates the right." *Id*. at 202, 121 S.Ct. 2151 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). The protection afforded by qualified immunity "safeguards 'all but the plainly incompetent or those who knowingly violate the law.'" *Brewster v. Bd. of Educ. of the Lynwood Unified Sch. Dist.*, 149 F.3d 971, 977 (9th Cir.1998) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

The court has concluded that Defendants did not violate Mr. Florer's constitutional rights. Therefore, it is not necessary to address Defendants' qualified immunity arguments.

## CONCLUSION

The undersigned recommends that Defendants' motion for summary judgment (Dkt. 307) be **GRANTED** and that Mr. Florer's claims against the Defendants be **Dismissed with Prejudice**. Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985). Accommodating the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **September 24, 2010**, as noted in the caption.

DATED this  2nd  day of September, 2010.

Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION - 31